IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Bevan & Associates,      :
LPA, et al.,
                         :
     Plaintiffs,
                         :
     vs.                   Case No. 2:16-CV-746
                         : Algenon Marbley
Richard Michael            Magistrate Judge
DeWine, et al.,          : Kimberly A. Jolson

     Defendants.         :

                         :

- - - - -

CONFIDENTIAL
DEPOSITION OF THOMAS W. BEVAN, ESQ.

- - - - -

Taken at Kegler, Brown, Hill + Ritter Co. LPA
65 East State Street, Ste. 1800
Columbus, OH 43215
August 29, 2017, 9:16 a.m.

- - - - -

Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

```
1            A P P E A R A N C E S

2

   ON BEHALF OF PLAINTIFF:
3
        Kegler, Brown, Hill + Ritter Co. LPA
4       65 East State Street, Ste. 1800
        Columbus, OH 43215
5       By Ralph E. Breitfeller, Esq.

6

   ON BEHALF OF DEFENDANT:
7
        Attorney General's Office,
8       Workers' Compensation
        150 East Gay Street, 22nd Fl.
9       Columbus, OH 43215
        By Cheryl J. Nester, Esq.
10

11 ON BEHALF OF BWC:

12      Attorney General's Office,
        Workers' Compensation
13      150 East Gay Street, 22nd Fl.
        Columbus, OH 43215
14      By Colleen C. Erdman, Esq.

15

   ALSO PRESENT:
16
        Patrick M. Walsh, Esq.
17

18

19

20

21

22

23

24
```

1                    Tuesday Morning Session

2                 August 29, 2017, 9:16 a.m.

3                     - - - - -

4                S T I P U L A T I O N S

5                     - - - - -

6       It is stipulated by counsel in attendance that

7   the deposition of Thomas W. Bevan, a witness

8   herein, called by the Defendant for

9   cross-examination, may be taken at this time by

10  the notary pursuant to notice and subsequent

11  agreement of counsel that said deposition may be

12  reduced to writing in stenotypy by the notary,

13  whose notes may thereafter be transcribed out of

14  the presence of the witness; that proof of the

15  official character and qualification of the notary

16  is waived.

17                  - - - - -

18

19

20

21

22

23

24

I N D E X

Examination By                                          Page

Ms. Nester - Cross                                        5

(No exhibits were marked.)

1      MR. BREITFELLER:  If we could put the

2   stipulation on the record that the parties agree

3   that at least at this point the transcripts of

4   these depositions will be treated as confidential

5   under the stipulated protective order.

6      And the parties further agree that upon

7   review of the transcript if there is some or all

8   of the transcript that can be designated not

9   confidential, then we will do that.

10      MS. NESTER:  Thank you.

11      THOMAS W. BEVAN, ESQ.

12   being first duly sworn, testifies and says as

13   follows:

14      MS. NESTER:  Before we start,

15   Mr. Breitfeller, can we have the stipulation that

16   this is by agreement?

17      MR. BREITFELLER:  Yes.

18      MS. NESTER:  Waive any formal notice?

19      MR. BREITFELLER:  Yes.

20      MS. NESTER:  And can we stipulate to

21   the qualifications of the stenographer?

22      MR. BREITFELLER:  Yes.

23      MS. NESTER:  Thank you.  Just so we get

24   that taken care of, all the details.

1                         - - - - -

2                    CROSS-EXAMINATION

3    BY MS. NESTER:

4    Q.          Mr. Bevan, I'm Cheryl Nester.  I'm with

5    the Attorney General's Office.  I represent the

6    Bureau of Workers' Compensation, the Administrator

7    of the Bureau of Workers' Compensation in her

8    official capacity and the Industrial Commissioners

9    in their official capacities, just so you know

10   where we stand there.

11            Patsy Thomas is unable to be with us

12   this morning due to a family issue, but I will do

13   my best here.

14            I don't feel like I have to tell you

15   how to take a deposition as I usually would.  I'm

16   pretty sure you know this.

17            But just so we're clear, if there is

18   anything, you know, you don't understand, ask me

19   to repeat it, rephrase it.

20            If you need to take a break, let me

21   know and we will.

22   A.          Okay.

23   Q.          Hopefully this will be relatively

24   painless.  But I do want to, just so we're making

1   a good record, get a little bit of your background

2   if I may.

3   A.          Okay.

4   Q.          So just officially could you state your

5   name for the record?

6   A.          Thomas W. Bevan.

7   Q.          And how are you employed?

8   A.          I'm employed by the law firm of Bevan &

9   Associates LPA, Inc.

10  Q.          Okay.  Are you a partner, I'm

11  presuming?

12  A.          A shareholder.

13  Q.          A shareholder.

14              Okay.  All right.  And how long has

15  that firm been in existence?

16  A.          I believe since 1994 or '95.

17  Q.          Okay.  I assume you were a founding

18  shareholder?

19  A.          Yes.

20  Q.          I always want to say partner, sorry.

21              Okay.  How long have you been

22  practicing law?

23  A.          Twenty six years.

24  Q.          And how long have you been practicing

1    Workers' Comp law?

2    A.          Twenty six years.

3    Q.          So from the beginning?

4    A.          Yes.

5    Q.          Okay.  How did you begin?

6    A.          Begin practicing law?

7    Q.          Uh-huh.

8    A.          After graduating from law school and

9    passing the bar, I joined an office sharing

10   arrangement that was called Bevan & Economus.

11   Q.          Okay.  Did that morph into Bevan &

12   Associates, or is that a separate entity?

13   A.          Well, it's a separate entity.

14   Q.          Legally it is, but I mean in -- in

15   actual practice, was it sort of the same group of

16   people?

17   A.          Three of us formed Bevan & Associates

18   and began practicing under Bevan & Associates.

19   And eventually the office sharing arrangement went

20   away and everybody in the office became an

21   employee of Bevan & Associates.  So various

22   attorneys moved away, moved out, and new attorneys

23   were hired.  And they were all hired by Bevan &

24   Associates.

1    Q.        Okay.  As a shareholder, what does your

2    position entail?

3    A.        I manage people, I litigate cases, I

4    handle cases.

5    Q.        Are you more or less the manager of the

6    entire firm?

7    A.        I would say that Pat and I manage the

8    entire firm together.

9    Q.        Together?

10    A.        Pat Walsh and I manage the entire firm

11    together.

12    Q.        Okay.  I'm just trying to --

13    A.        Yeah.

14    Q.        With respect to Bevan & Associates

15    specifically at this point in time, what type of

16    cases does Bevan & Associates handle?  What type

17    of legal cases?

18    A.        We handle Workers' Compensation claims,

19    asbestos claims, personal injury claims.  That's

20    probably 99.9 percent.  We'll do an occasional

21    will or an occasional estate.  We did do Social

22    Security Disability which we do not do any more.

23    Q.        Oh, okay.

24    A.        That's really it.

1    Q.        If you've said this already, I'm sorry.

2    Did you say you do medical malpractice?

3    A.        Occasional medical malpractice.  We'll

4    handle in-house an occasional malpractice case.

5    More often than not, we refer them out, but we do

6    handle some.

7    Q.        Okay.  I was just looking at your

8    masthead in your website and I didn't know how

9    that shook out.

10   A.        Uh-huh.

11   Q.        What would you say the percentage of

12   cases, not income but cases is of Workers'

13   Compensation cases for your firm?  Would you say

14   50 percent, 25 percent?  Ball park it for me.

15   A.        This would be a very rough estimate.  I

16   would say that of our clients, I would say over

17   half of them, maybe as much as two-thirds of them

18   are Workers' Compensation clients.

19   Q.        Okay.

20   A.        That's the largest number of individual

21   clients I believe would be Workers' Compensation.

22   Q.        Okay.  Thank you.

23             What portions of -- well, that's --

24   phrasing this is going to be difficult.  When

1   you're handling a Workers' Compensation case, how

2   many of the -- or what percentage would you say

3   are administrative as opposed to .512 appeals?

4   A.      Oh, 99 percent are administrative.

5   Q.      Okay.  Do you handle any mandamus cases

6   in Workers' Comp?

7   A.      We have.

8   Q.      But very few or not very many?

9   A.      Oh, yeah, not very many.  A handful.

10  Q.      There just aren't very many --

11  A.      No.

12  Q.      -- across the board?

13  A.      Yeah.

14  Q.      Okay.  Do you refer out any of the .512

15  appeals to other firms or other attorneys?

16  A.      No.  We handle those in-house.

17  Q.      So if your client's Workers'

18  Compensation case required a .512 appeal, you'll

19  handle those yourself?

20  A.      Yes.

21  Q.      Do you have different attorneys doing

22  different portions, like some people are just .512

23  appeals, some people are administrative?

24  A.      Well, we have three attorneys who's

1    primary responsibility is Workers' Compensation,

2    and one of those three I believe does most of the

3    .512 appeals.

4    Q.       Okay.

5    A.       The other two may do an occasional .512

6    appeal.

7    Q.       Okay.  How many attorneys are working

8    for Bevan & Associates right now, if you count

9    yourself and Mr. Walsh?

10            MR. WALSH:  I'm sorry?

11            MS. NESTER:  If you count yourself and

12   Mr. Walsh.

13   A.       Nine attorneys are employed by Bevan &

14   Associates.

15   Q.       Okay.  And are you all at the same

16   address?

17   A.       Yes.

18   Q.       Okay.  So you just have the one office?

19   A.       Well, we have a satellite office in

20   Akron.

21   Q.       Okay.

22   A.       But nobody -- it's just an office.

23   Nobody staffs it.  We use it occasionally --

24   Q.       More use for deposition?

1   A.          -- to meet with a client or --

2   Q.          Meet with clients?

3   A.          Yes.

4   Q.          Okay.  Do you have any attorneys who

5   just work from home as opposed to coming into the

6   office?

7   A.          No.

8   Q.          Okay.  And you don't subcontract out

9   your Workers' Compensation work to any of your

10  other attorneys?

11  A.          You know, we'll refer out a federal

12  workers' compensation claim.

13  Q.          Uh-huh.

14  A.          We do do those.

15  Q.          Yeah.  Okay.

16  A.          But --

17  Q.          All right.  That was all background

18  stuff, so I'm done with that now you'll be happy

19  to know.

20          I want to get to some of the heart of

21  what we're in court on here.  So I'd like to talk

22  to you about kind of how you guys have handled

23  your advertisements in three stages.  We're going

24  to talk about three stages:  One is before 2007,

1    before the law changed and made Workers' Comp

2    claim information confidential, so prior to 2007.

3    And then we're going to talk about the period from

4    2007 to 2016 when the law changed but prior to

5    your information as to some subpoenas.  And then

6    we'll talk about 2016 to the present, okay?

7    A.          Okay.

8    Q.          So let's start with the first pre-

9    confidential era.  So prior to 2007, how did

10   Bevan & Associates advertise for new Workers'

11   Compensation clients?  What kind of advertisements

12   did you do?

13   A.          We advertised at some point in

14   phonebooks.  We advertised to existing clients.

15   We -- of course we took calls of people that would

16   either refer us cases or a friend of theirs was

17   represented by us and would refer their friend to

18   us.  We worked with a lot of unions, and the

19   unions in some instances the unions did not handle

20   Workers' Compensation claims themselves, and so we

21   would go to the union hall once a week and anybody

22   that wanted to meet with an attorney to discuss a

23   Workers' Comp matter would come in and meet with

24   us.  There was other attorneys that handled

1    workers' compensation claims, but if the claim got

2    too difficult for them to handle, they would

3    suggest that the worker talk to us and those

4    workers would hire us.

5              And then we did from 2004 through that

6    period of 2007, we obtained information from the

7    Bureau of Workers' Compensation which included

8    injured worker's names, addresses, claim number,

9    date of birth -- I'm sorry, date of injury,

10   allowed condition, whether the person had an

11   attorney or not, whether they received benefits or

12   -- or those kind of things.

13   Q.        Okay.

14   A.        And so we did direct mail

15   advertisements to those injured workers during

16   that time frame.

17   Q.        Okay.

18   A.        I think that's most of what we did to

19   market our services.

20   Q.        And I know that it's hard to do that.

21   Some things that occurred to me, just let me ask

22   you a couple -- and I don't know I'm just

23   suggesting this.  Did you ever do any billboards?

24   A.        I don't think we did billboards.

1  Q.        Okay.

2  A.        No.  I don't recall ever doing

3  billboards.

4  Q.        Okay.  Newspaper ads or some general

5  circulation publication?

6  A.        I believe maybe we did some newspaper

7  ads.

8  Q.        Okay.  You mentioned unions.  Did you

9  put any ads in, like, a union trade news

10  publication, that sort of thing?

11  A.        I'm not sure.

12  Q.        Okay.

13          MR. BREITFELLER:  And, Cheryl, just so

14  I'm clear on your questions, when you're asking

15  about billboards, newspapers, union publications,

16  you're talking now about the period up to 2007?

17          MS. NESTER:  Yes.

18          MR. BREITFELLER:  Okay.

19          MS. NESTER:  I am.

20  BY MS. NESTER:

21  Q.        Did you do any radio or TV advertising

22  prior to 2007?

23  A.        I don't think so.

24  Q.        Okay.  And I'm never clear -- I'm very

1  non-technological myself, so I'm never clear what

2  happens when.  But did you during that period do

3  any online social media that you might have paid

4  for as opposed to your own pages?

5  A.      I don't -- I don't know.

6  Q.      Okay.

7  A.      I'm not sure when our website started,

8  so I don't know.

9  Q.      Okay.  Well, like I said, technology is

10  not my thing.

11          Okay.  You mentioned the union halls,

12  just very quickly to follow up on that one.  The

13  unions would offer representation to their

14  membership for Workers' Comp.  But if it became

15  something more complex, they would call you guys

16  in and offer you guys as possible representation;

17  is that correct?

18  A.      Some unions.

19  Q.      Some?

20  A.      Not all.

21  Q.      Well, the unions that you were working

22  with --

23  A.      Some of the unions didn't handle

24  Workers' Compensation at all.

1    Q.        At all.  Okay.

2    A.        And so if one of their workers had an

3    injury, you know, they knew that we had an

4    attorney in the union hall on a certain day at a

5    certain time and they could come down and speak

6    with an attorney.

7    Q.        Got it.  Okay.  Thank you.

8              You also talked about obtaining

9    information through the public records requests

10   from the Bureau of Workers' Compensation.  Did you

11   then use a mailing service for those -- was that

12   mailed advertising?

13   A.        Yes.

14   Q.        Okay.  Prior to 2007, do you know the

15   names of some of those mailing services?

16   A.        I believe we used Miller's Presort.

17   Q.        The whole time?

18   A.        That's the only one that I recall at

19   this time.

20   Q.        Okay.  So how did the information get

21   to them?  Did you just send the lists that the

22   Bureau gave you to Miller's Presort?  How did they

23   know who to mail to?

24   A.        I believe we sent that information to

1    them.  But I was not involved in that, so I am not

2    certain how we did it, whether we dropped off a

3    disk, whether we dropped off a -- you know,

4    whether we e-mailed them stuff.  I don't know for

5    sure, but --

6    Q.        Okay.

7    A.        -- we provided them information.  But I

8    wasn't involved in that process, so I don't really

9    know.

10   Q.        More clerical?

11   A.        Well, it just wasn't the part of the

12   firm that I was involved in, so --

13   Q.        I take it that means it didn't rise to

14   your level?

15   A.        No.  Maybe I don't rise to that level I

16   think is the better term.

17   Q.        That, I understand.

18             Beyond the Bureau of Workers'

19   Compensation at that time, this is pre2007 still,

20   was there any other source from which you obtained

21   addresses of individuals to provide to Miller's

22   Presort?

23   A.        Well, we would have been doing

24   advertisements to potential asbestos clients --

1    Q.       Uh-huh.

2    A.       -- during that time frame, and I

3 believe we used Miller's Presort for that as well.

4 And that data would have been obtained from either

5 Social Security or Ohio -- I don't know what

6 department, but it would be death data from the

7 State of Ohio.

8    Q.       Okay. Did you ever make any request

9 for information from the Industrial Comission of

10 Ohio?

11    A.       During that time frame?

12    Q.       Prior to 2007. Yes. I'm sorry.

13    A.       I don't recall.

14    Q.       Okay.

15    A.       I don't believe so, but I don't recall

16 for sure.

17    Q.       You just made me make sure I ask that

18 question the next one.

19    A.       Yeah.

20    Q.       Okay. And when you obtained

21 information from the Bureau of Workers'

22 Compensation of those names, was there a fee

23 charged for that?

24    A.       I believe so.

1   Q.        Something minimal?

2   A.        Very small fee, yes.

3   Q.        Okay.  And again we're still talking

4  prior to 2007.  Do you recall how often you would

5  be requesting this information, was it quarterly,

6  monthly, do you remember?

7   A.        I don't recall.

8   Q.        Okay.  And do you recall any other

9  sources other than the Bureau that you used to

10  pursue a mail advertising or solicitation program

11  to obtain Workers' Compensation clients, not

12  asbestos but Workers' Compensation clients?

13   A.        Well, in --

14   Q.        Well, separate?

15   A.        Asbestos sometimes involved Workers'

16  Compensation.

17   Q.        True.  That is true.

18   A.        And so during that time frame, I don't

19  -- I don't recall any others.

20   Q.        Okay.  We've talked about a number of

21  advertising formats.  Can you think of any others

22  that you might have used prior to 2007?

23   A.        I don't recall at this time.

24   Q.        Okay.  All right.  We're going to

1    switch time periods then.  Let's go 2007 to 2016.

2    We're going to kind of go through the same thing

3    we just did.  So between those two time periods,

4    what were the types of advertising you used to get

5    new Workers' Compensation clients?

6    A.        I think it would include phonebooks,

7    during this time certainly Internet, again, you

8    know, contacting existing clients, the same

9    union-type work, the same thing I talked about as

10   far as the death data, the Social Security data.

11   I think that probably also included maybe voter

12   registration information.  And then of course we

13   did mail advertisements to people that we knew had

14   asbestos claims and then we did mail

15   advertisements -- general mail advertisements to

16   addresses where we hoped that there was somebody

17   that lived at that address that had filed a

18   Workers' Compensation claim and -- and I think you

19   understand there's a difference between the two,

20   so --

21   Q.        We'll get to that.

22   A.        Uh-huh.

23   Q.        Okay.  Again during this period 2007 to

24   2016, did you do any billboard advertisements then

1   that you recall?

2   A.      I don't recall any.

3   Q.      So I mean are -- would you basically

4   say you've never done a billboard?

5   A.      I don't think we have.  And I just

6   don't recall.  And so I'm -- I would say probably

7   not, but I'm not positive that we've never done

8   billboard advertising.

9   Q.      Okay.  Again ads in newspapers?

10   A.      I don't recall doing any newspaper ads

11   during that time frame.

12   Q.      Okay.  Yellow Pages?

13   A.      I'm pretty sure that we had phonebook

14   ads during that time.

15   Q.      Oh, you did say that.

16          Radio or television ads?

17   A.      Well, we did television ads for

18   asbestos claims --

19   Q.      Okay.

20   A.      -- which, you know, could involve

21   Workers' Compensation on some of them.  We

22   definitely did TV ads during that time.

23   Q.      Okay.  Social media?

24   A.      What we do on the Internet, I'm not

1    sure.  Something called YP we've done.  I don't

2    really know what that is, so --

3    Q.       Okay.

4    A.       And of course we have a website and we,

5    you know, offer our services on our website.

6    Q.       Okay.  And again you were talking about

7    general mail advertising.  Who was your mailing

8    service at this point?

9    A.       It would -- we definitely used Miller's

10   Presort, and I don't recall using anybody else

11   during that time.

12   Q.       Okay.  All right.  During this time

13   period since this is 2007 to 2016, from where did

14   you obtain the addresses for Workers' Compensation

15   advertising to send to Miller's Presort?

16   A.       Well, we had all the data that we had

17   collected up until 2007 --

18   Q.       Uh-huh.

19   A.       -- which included the specific data on

20   injured workers.

21   Q.       Correct.

22   A.       And so we continued to use that to

23   advertise.

24   Q.       So you would year after year send it to

1  the same people probably?

2  A.        Yes.  Yes.

3  Q.        Okay.

4  A.        And then from a company called Capital

5  Publishing, we obtained -- and I believe that was

6  just addresses, just a street number, a city,

7  state and zip code.  I don't recall that there was

8  any other information on that.  Although, I

9  thought maybe whether the person had a lawyer or

10  not may have been in there, but I -- I'm frankly

11  not positive on that.

12  Q.        Where did Capital Publishing obtain

13  their data, do you know?

14  A.        I assume that they obtained it from the

15  BWC, but I don't -- I'm sure that's where they

16  obtained it.  I don't know where else we could

17  have.

18  Q.        Were they purporting to be a

19  journalistic service?

20  A.        I believe they were a journalistic --

21  that's what they told me.

22  Q.        Okay.  You didn't check their

23  credentials?

24  A.        I don't know if I -- how I checked them

1   out.

2   Q.          Okay.

3   A.          I don't know if I --

4   Q.          But your belief was that they were

5   journalists?

6   A.          My belief is that they were a

7   journalistic group and that's why we were able --

8   entitled to get the information.

9   Q.          Okay.  Do you also recall a company by

10  the name of Info Partners Corporation out of New

11  Jersey?

12  A.          That name, I don't recall.

13  Q.          No.  Okay.

14              Is it possible that you worked with

15  some other companies other than Capital Publishing

16  that were journalistic in nature or that gave you

17  addresses?

18  A.          Well, there was -- there was -- Jack

19  Duncan, Jack Henry.

20  Q.          Okay.  Jack Duncan?

21  A.          Yeah.  But the name that you mentioned,

22  that name doesn't --

23  Q.          Doesn't ring a bell?

24  A.          Doesn't ring a bell with me at this

1 time.

2 Q. Okay. All right. Since you brought up

3 Jack Duncan, we'll go there now. What was Jack

4 Duncan?

5 A. That was a company set up by a

6 journalist Regina Mace. And I'm not sure if she

7 had somebody else involved. I -- I thought maybe,

8 but I don't know -- I don't recall the name. But

9 that was set up by her.

10 Q. Okay. How did you come to know about

11 either Jack Duncan or Regina Mace?

12 A. Well, Regina Mace is somebody that I

13 knew because she had been a -- she was a reporter,

14 of course, but she had been a client of the firm

15 years ago on a claim, I think a -- some type of an

16 injury claim --

17 Q. Okay.

18 A. -- many years ago.

19 Q. Okay. What was your knowledge of her

20 journalistic background?

21 A. I know she reported for the Lorain

22 Journal for -- I don't know if she reported for

23 the Akron Beacon Journal for record publishing. I

24 don't know who else she, you know --

1   Q.        Okay.

2   A.        But I've seen her articles.

3   Q.        Do you know why she set up the company

4  as Jack Duncan?

5   A.        I don't know.

6   Q.        As opposed to just being Regina Mace?

7   A.        I don't know.

8   Q.        Okay.  All right.  And so you would

9  also have obtained addresses from Regina Mace/Jack

10  Duncan?

11   A.        Yeah.  I think it was the same as from

12  Capital Publishing, it was just a street address,

13  city, state.

14   Q.        Same type of information that Capital

15  Publishing provided you?

16   A.        As far as I recall, yes.

17   Q.        Okay.  Do you know how often you would

18  have received information from -- I'm going to

19  call Regina Mace and Jack Duncan as the same

20  entity, so I'll just call her Regina Mace, even if

21  we're talking Jack Duncan, if that's alright with

22  you.

23   A.        That's fine with me.

24   Q.        Do you know how often you would have

1    received information from Regina Mace?

2    A.        No.

3    Q.        Okay.  Did you ask her to obtain

4    address information for you?

5    A.        I don't -- you know --

6    Q.        For purposes of Bevan & Associates?

7    A.        I don't recall.  I didn't really have,

8    you know, any -- I wasn't really involved in that

9    -- in the process when she would bring stuff in or

10   when -- if we asked or if she offered when she had

11   something.  I really don't know how that worked.

12   Q.        Okay.  Who would know that?

13   A.        What's that?

14             Well, I think Pat would probably know

15   more about that --

16   Q.        Okay.

17   A.        -- because he would handle the data

18   part of it.

19   Q.        Okay.  All right.  And for both Capital

20   Publishing and Regina Mace, I assume you had to

21   pay a fee for the information you obtained?

22   A.        Yes.

23   Q.        Do you know what the fees were for

24   each?

1     A.        I really don't recall.

2     Q.        Okay. In the period 2007 through 2016,

3     how long was your relationship with Capital

4     Publishing? Did it continue through that entire

5     period?

6     A.        No.

7     Q.        How long did it continue, if you know?

8     A.        I don't recall.

9     Q.        Just early in the period or --

10     A.        Oh, it was definitely early in the

11     period.

12     Q.        Okay.

13     A.        And I don't know if it was a year, two

14     years, three years. I don't recall.

15     Q.        Something kind of short then?

16     A.        Yes.

17     Q.        Okay. When did you begin a

18     relationship for purposes of obtaining BWC claim

19     information with Regina Mace?

20     A.        I don't recall for sure.

21              MR. BREITFELLER: Let me just --

22              MS. NESTER: Would you like me to

23     rephrase that?

24              MR. BREITFELLER: No. You know, we've

1    gone a little bit into this.  And at this point I

2    just want to -- well, let's go off the record if

3    we can for a second.

4             MS. NESTER:  Sure.

5             (A short recess is taken.)

6             MS. NESTER:  All right.  Back on the

7    record, please.

8    BY MS. NESTER:

9    Q.        All right.  Can you answer that

10   question?

11   A.        I don't recall for sure.  I would say

12   -- I would estimate eight years ago.

13   Q.        Okay.

14   A.        But I don't recall for sure.

15   Q.        And did it continue through 2016 then

16   at least until you --

17   A.        I don't recall when we -- I'm not

18   certain when we last got information or any

19   addresses from Regina Mace or Jack Duncan.  I

20   think it's been probably, you know, three years

21   since we last did an advertisement based on

22   anything, addresses or anything.

23   Q.        Okay.  Do you know if you had -- I'm

24   probably going to have to ask Mr. Walsh this one

1   too, but we'll ask you anyway too.

2          Do you know if you had any written

3   agreements with Capital Publishing for their

4   services?

5   A.       Oh, I don't recall.

6   Q.       Okay.  Do you know if you had any with

7   Regina Mace or Jack Duncan for their services?

8   A.       I don't recall that either.

9   Q.       Okay.  As far as you can recall then

10   Capital Publishing and Regina Mace/Jack Duncan

11   would have been the two entities you used for that

12   type of information for -- with respect to running

13   a mail advertising program to obtain Workers'

14   Compensation clients?

15   A.       Well, plus what we got from the BWC.

16   Q.       So that would be pre2007 though, right?

17   A.       And we still had that information that

18   we continued --

19   Q.       Correct.  But the old information

20   from --

21   A.       Yes.

22   Q.       Okay.  Thank you.  I appreciate the

23   clarification.

24   A.       And again plus the death data, the

 1    Social Security, the -- this other data that I

 2    talked about as well.

 3    Q.        Okay.  We're a little off subject I

 4    suppose.  But how does one use death data?  Are

 5    you just looking to do death claims at that rate,

 6    is that what --

 7    A.        It would certainly be a death claim.

 8    Q.        Yeah.  So that is for seeing if --

 9    A.        Uh-huh.

10    Q.        Okay.  I've never done this.  I don't

11    know.  I work for the State.

12              MR. BREITFELLER:  Have you ever been

13    the executor of an estate?

14              MS. NESTER:  Only my parents, yes.

15              MR. BREITFELLER:  Yeah.  Well --

16              MS. NESTER:  There you go.

17    Q.        Okay.  Other than the Bureau and the

18    two journalistic type entities we've talked about,

19    can you think of any other sources you've used to

20    obtain addresses to pursue a mail advertising

21    solicitation program to obtain Workers'

22    Compensation clients?

23    A.        Not that I recall.

24    Q.        Okay.  In your responses to our request

1    for production, there was a May 31st, 2007 letter

2    from Capital Publishing Corporation which

3    indicated that they were providing -- they

4    provided you a list of Ohio counties in which they

5    had chiropractic clients who subscribed to their

6    Workers' Compensation publications.  Does that

7    ring any bells for you?  What was that about?

8    A.          It rings a bell that I -- you know, I

9    -- I don't think I personally reviewed all the

10   documents that we produced, so I'd have to -- I

11   could take a look at that.  It rings a bell that

12   Capital Publishing -- that there was chiropractors

13   subscribing to something from Capital Publishing

14   as well.

15   Q.          Would they have any ability to obtain

16   patient names from the chiropractors who might be

17   looking for Workers' Compensation coverage?  Is

18   that the type of thing that Capital Publishing was

19   offering to you guys?

20   A.          Wait.  I'm not sure I understand what

21   your question was.

22   Q.          Well, he was saying it listed 15

23   counties, Ohio counties in which there were

24   chiropractors.  How was that of import to you?  I

1   mean --

2   A.          I don't think it would be important to

3   me at all.  I presume he was saying that he was,

4   you know, providing the addresses to chiropractors

5   as well, but I --

6   Q.          Okay.

7   A.          -- don't know.  I'd have to take a look

8   at the document, but that's all I could assume.

9   It wouldn't be of any interest to me.

10  Q.          Okay.  We'll switch time periods again.

11  We'll just go from 2016 to the present now.  A

12  short time period.

13  A.          Uh-huh.

14  Q.          So in this time period how have you

15  been advertising for workers -- specifically for

16  Workers' Compensation clients?

17  A.          Specific to Workers' Compensation

18  clients, we really haven't done anything.  I think

19  our website is still up.

20  Q.          Okay.

21  A.          We offer our services through our

22  website.  You know, we still advertise for

23  asbestos clients, but that's really since '16 I

24  think all we've done.  We stopped pretty much our

1    Workers' Compensation advertising.

2    Q.        Okay.  Do you still use Miller's

3    Presort in this period?

4    A.        I'm assuming we've -- in that period

5    I'm fairly certain we've used Miller's Presort.

6    Q.        Would you still --

7    A.        For as -- I'm sorry.  For asbestos.

8    Q.        Okay.

9    A.        We used Miller's Presort for just

10   general mailings to our clients.  If we have a

11   reason to do a bulk mailing to clients, we use

12   Miller's Presort.

13   Q.        Okay.  Would you still be sending out

14   advertisement for Workers' Compensation purposes

15   using pre2007 information?

16   A.        No.  We stopped --

17   Q.        Stopped that?

18   A.        -- in whenever that was, beginning of

19   2016.

20   Q.        Okay.  Do you still do any work with

21   the unions?

22   A.        Not -- very little --

23   Q.        Okay.

24   A.        -- if any.  Most of them have shut down

1   and so, yeah, very little.

2   Q.     Okay.  All right.  So you have not used

3   Capital Publishing or Regina Mace/Jack Duncan in

4   this time period?

5   A.     No.  I mean, we haven't used anything

6   from -- even from Regina Mace for probably three

7   years I think.  Pat might know better, but it's

8   been a long time.  It was long before 2016.

9   Q.     Okay.  Well, then let me backtrack us

10   then for a minute.

11   A.     Yeah.

12   Q.     We'll go back to the middle period here

13   where we're talking about 2007 to 2016.

14   A.     Uh-huh.

15   Q.     Okay.  So if you had prior to 2016

16   stopped using Regina Mace's or Jack Duncan's

17   services for obtaining addresses for Workers'

18   Compensation potential clients, was there any

19   other source for those addresses at that point

20   then?

21   A.     We weren't getting addresses from any

22   other source.  I mean, whether there is another

23   source out there, I don't know.

24   Q.     No.  No.  Were you using another one

1    was the question.

2    A.         No.

3    Q.         Okay.  So you were really not -- am I

4    correct that you really were not doing mailed

5    advertising for purposes of obtaining Workers'

6    Compensation clients sometime before 2016?

7    A.         The last time we had done it -- I'm not

8    sure if it was '15, 2015 or if it was 2014.  We

9    intended to do it --

10   Q.         Okay.

11   A.         -- and would have done it but for this

12   threat of this investigation from the BWC, we

13   ceased doing it.

14   Q.         All right.  My understanding -- well,

15   never mind my understanding.

16              At what point did you learn about the

17   invest -- the BWC investigation?

18   A.         I don't recall exactly, but I believe

19   it was early 2016.

20   Q.         Okay.  And is it at that point that you

21   ceased or was it prior to that?

22   A.         Prior to that was when the -- was the

23   last time we had done it.  We had intended to do

24   it more but we ceased, you know, doing it.

1    Q.          As soon as you knew about the

2    investigation?

3    A.          Because of this threat.

4    Q.          Okay.  But that was the reason you

5    stopped?

6    A.          Yes.

7    Q.          Okay.  I'm just making sure I hadn't

8    missed something.  Thank you.

9    A.          Yeah.

10   Q.          Okay.  I want to just ask you a couple

11   brief questions.  We're almost finished.

12               With respect to the declaration that

13   you put into motion for summary judgment --

14   A.          Okay.

15   Q.          -- at No. 14 of that declaration you

16   had made reference to -- or you had made the

17   statement that within the Workers' Compensation

18   system employers are almost always represented by

19   lawyers.  And the second sentence was Ohio Bureau

20   of Workers' Compensation is always represented by

21   lawyers.  What part of the system are you speaking

22   to?  Are you talking about the administrative

23   process at that point?

24   A.          Well, it could be administrative or

1    court, yes.

2    Q.        Right.

3    A.        Either one.

4    Q.        In you're experience, the Bureau of

5    Workers' Compensation always has a lawyer present

6    at administrative hearings?

7    A.        Not always present, but there's a

8    lawyer that represents the Bureau of Workers'

9    Compensation on every claim.  They have a legal

10    department.  And so many of our claims that we

11    handle have a lawyer present, yes, a BWC lawyer

12    present.

13    Q.        At the hearing?

14    A.        If the employer is not being

15    represented by a lawyer.

16    Q.        Okay.

17    A.        But there's always a lawyer.  Now, the

18    lawyer may determine that he or she doesn't need

19    to attend that hearing, and that's his or her

20    choice.  But the BWC always has a lawyer

21    representing it.

22    Q.        But not necessarily at the hearing?

23    A.        Okay.  Again, not necessarily at the

24    hearing.  I guess it would be up to that lawyer to

1    determine whether or not he or she needed to

2    attend that hearing.

3    Q.        I was just trying --

4    A.        Yes.

5    Q.        You must have seen a lot more

6    administrative hearings with BWC attorneys than I

7    have.  I was just trying to make sure what we're

8    talking about, if you were just talking about the

9    appeals to court or if you were talking about the

10   administrative process as well.

11   A.        Yeah.  And that's -- you know, has

12   definitely evolved over the years.  When I first

13   started practicing, the Bureau never sent a lawyer

14   to the hearings.  Now it is extremely common,

15   certainly on the -- on the hearings where there's

16   an issue that's important to the injured worker.

17   Q.        So you would not agree with the

18   statement that said BWC attorneys seldom make an

19   appearance at the administrative level?

20   A.        I would disagree with that.

21   Q.        Okay.

22   A.        Certainly if you are talking over the

23   last 10 years.  If you told me that, you know,

24   1991 when I started practicing to 1995, I would

1    agree with that statement.  But I would not agree

2    with that statement today.

3    Q.       Okay.  I just wanted to verify.

4            All right.  Can we go off the record

5    for a moment, please.

6            (A short recess is taken.)

7    Q.       Back on the record for a moment.

8            Mr. Bevan, thank you very much.  We're

9    going to conclude at that point.  I don't think I

10   have any further questions for you.

11   A.       Thank you.

12   Q.       I appreciate your time and cooperation

13   this morning.

14   A.       Thank you.

15           MR. BREITFELLER:  And we'll read.

16               (Signature not waived.)

17                 - - - - -

18           Thereupon, the foregoing proceedings

19           concluded at 10:10 a.m.

20                 - - - - -

21

22

23

24

1  State of Ohio    :    C E R T I F I C A T E
   County of Franklin: SS

2

3       I, Stacy M. Upp, a Notary Public in and for the
   State of Ohio, certify that Thomas W. Bevan was by
   me duly sworn to testify to the whole truth in the

4  cause aforesaid; testimony then given was reduced
   to stenotype in the presence of said witness,

5  afterwards transcribed by me; the foregoing is a
   true record of the testimony so given; and this

6  deposition was taken at the time and place
   specified on the title page.

7

8       Pursuant to Rule 30(e) of the Federal Rules of
   Civil Procedure, the witness and/or the parties
   have not waived review of the deposition

9  transcript.

10      I certify I am not a relative, employee,
   attorney or counsel of any of the parties hereto,

11  and further I am not a relative or employee of any
   attorney or counsel employed by the parties hereto,

12  or financially interested in the action.

13      IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office at Columbus, Ohio, on

14  August 29, 2017.

15

16

17

18

19  _Stacy M. Upp_ (signature)

20  _____
   Stacy M. Upp, Notary Public - State of Ohio

21  My commission expires August 6, 2021.

22

23

24

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling   2-Word Omitted   3-Wrong Word
4-Clarification   5-Other (Please explain)

| Page/Line | Correction or Change | Reason Code |
|-----------|----------------------|-------------|
| P 13, L 14 | WE DO NOT DO THOSE. | _____ |
| P 14, L 24 | There were Other Unions... | _____ |
| P 27, L 23 | Capitalize "Record Publishing" | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

I, Thomas W. Bevan, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date 8/3/11  Signature _____

The witness has failed to sign the deposition
within the time allowed.

Date_____Signature_____

Ref: SU25623TB   S-SU P-BW